## SAMUEL C. BARNEY

*vs.*

## J. W. DeKRAFT.

1. A personal judgement or decree obtained in any State of the Union over a non-resident who has not been served with process within the State, or who has not voluntarly appeared and subjected himself to the jurisdiction of the Court, has no extra teritorial validity, and does not come within the operation of the fourth article of the Constitution declaring the effect within one State of judicial proceedings had within another; this rule includes decrees of divorce.
2. The Orphans' Court has no jurisdiction to inquire whether a father be a fit person to be intrusted with the personal custody and education of his children; its jurisdiction as to him extends only to the due care and management of the infants estate.
3. Where, for any reason, a father becomes incompetent or unfit to act as the natural guardian of his children, the remedy is in a Court of Chancery.

Decided June 12th, 1862.

APPEAL from an order of the Orphans' Court refusing to grant letters of guardianship to a father.

Mr. WALTER D. DAVIDGE, for appellant.

Mr. RICHARD S. COXE, for appellee.

MERRICK, J., delivered the opinion of the Court:

The present appeal has its origin in one of those conditions of family embroilment, always painful and distressing, which rarely come to the notice of courts of justice, and which still more rarely are investigated by courts with either moral or material advantage to the parties involved. The legal aspect which the present controversy assumes will relieve this tribunal from a critical balance of the criminations and recriminations with which the record

abounds. Simple justice requires of us, however, to observe that the most flagrant charge against the appellant is utterly unsupported and unwarranted by the evidence which has been adduced in that behalf.

The appellee as *prochien ami* and near relative filed his petition against the appellant in the Orphans' Court praying that tribunal to refuse to the appellant the guardianship of the persons and estates of the appellant's four children, alleging that he was an unfit and improper person for the office and charging that he had been divorced from his wife, Mary DeKraft Barney, now deceased, by a decree of the District Court of Jaspar County, in the State of Iowa, and that by that decree the appellant had been deprived of the custody of his children and that his moral obliquity also was therein fully adjudged. The appellee made sundry specific charges in addition and offered to sustain them by proof. The cause was heard and proofs taken at great length before the Orphans' Court. That Court finally adjudged that inasmuch as the Court of Iowa had divorced the wife from the appellant and had decreed his acts, conduct and character to have been such as to render him unfit to have the custody of the minor children of the marriage, and had committed their custody to the mother, the appellant was conclusively bound by that decree, and while unreversed it furnished an answer to his claim for the custody of persons and estate of his children. The Court also determined that the claim of guardianship of the father ought to be controlled by the fact that the estate of the children was derived under the will of the late Edward DeKraft, the maternal grandfather of the children and he had by his will declared that his estate should be held by trustees in trust for his daughter and her heirs free from the control or disposal of any husband she might have and exempt from his debts, contracts or engagements. In both of these conclusions we think there was error in the decision of the Orphans' Court.

It appears from the record that the appellant was married to his late wife in the District of Columbia in 1847, and continued to reside here for many years; that some years prior to her decease they went to Paris, in France, and there sojourned, he being all the while a lieutenant in the navy of the United States; and that private difficulties having arisen between them, proceedings were instituted in a French tribunal which decreed temporary custody of the children and a temporary separation of the parties with leave to the wife to come to America to prosecute a petition for divorce.    In the spring of 1860 Mrs. Barney came to the United States unattended by her husband, and proceeding to the State of Iowa, where neither she nor her husband had ever resided, she there filed in the District Court of Jaspar County, her petition for divorce, caused publication to be made against her husband as an absent defendant, and procured a decree of divorce against him by default in September following, containing the allegations and determinations above referred to and which are now relied upon as irrefragably conclusive against the appellant not only as touching the marital relation, but also of the facts and charges recited as the basis of the decree, and of the parental rights of the father over his children.

What might or might not be the effect within the State of Iowa of an *ex parte* decree of divorce obtained as was the present, and whether all the statutory requirements of the law of Iowa were complied with so as to vest the District Court of Jasper County with a jurisdiction entitled to consideration within the territorial limits of that State we need not here enquire, it being conclusively settled by the Supreme Court of the United States in repeated adjudications that a personal judgment or decree obtained in any State of the Union over a non-resident who has not been served with process within the State, or who has not voluntarily appeared and subjected himself to the jurisdiction of the

Court, has no extra territorial validity, and does not come within the operation of the fourth article of the Constitution declaring the effect within one State of judicial proceedings had in another State. Among other authorities see Shelton *vs.* Tiffin, 6th Howard, 143; Boswells Lessee *vs.* Otis, 9th H., 336; Landes *vs.* Brandt, 10th H., 348; D'Arcy *vs.* Kitchen, 11 H., 165, and Webster *vs.* Reid, 11th H., 437. And that a case of divorce is embraced within the principle, see 12th Barbour, 640 and 28 Barbour 23.

Controlled by these authorities, as well as by the dictates of manifest justice, we are of opinion that the record of the Court in Iowa was not admissible evidence for any purpose against the appellant in the present controversy.

The provisions of the will of Edward DeKraft, which were relied upon as the second ground of exclusion, when examined, have no relation to the question of guardianship; indeed it cannot be deduced from the terms of the instrument that the matter of guardianship was at all in the mind of the testator. The provisions of the will are directed solely to the exclusion of any husband from that absolute right of property which the marriage confers over all the personal property of the wife, and from the usufruct for life of the real estate, with all its rents and profits. The terms of this will debar him from these during the marriage, and also from his right of survivorship and curtesy; according to the doctrine of the cases of Marshall and Beall, 6 Howard, 70, and Ward *et ux. vs.* Thompson, 6 Gill and Johnson, 349; but the strict terms of this settlement no more militate against the right of guardianship of the surviving husband than would the terms of a deed in fee simple from a total stranger to the children for a house and lot in this city.

The foregoing considerations dispose of the grounds of judgment relied upon by the Court below, but as the act of assembly requires this Court on appeal to go further (see

18th section of sub. ch. 15 of act of 1798) the question re-- mains whether upon the testimony of the living witnesses produced by the petitioner the Court below was authorized to refuse to accept from the appellant a sufficient bond if tendered under the statute as natural guardian to his infant children. In other words, has the Orphans' Court jurisdiction to inquire into the character and conduct of a father to exclude him from the care and custody of his infant children and to commit their persons as well as estates to a stranger. The power is an inquisitorial power of a most delicate and difficult sort which must inevitably in its exercise bring to light numerous family differences, family difficulties, and family misfortunes which it were better for the honor of humanity to cover with the thickest viel of charitable silence. For such investigations the ma-- chinery of courts of justice is ill-adapted, especially the Orphans' Courts, whose interference with parental discipline could rarely be exerted usefully. The vice-chancellor, in 2d DeGex & Smale, p. 474, says: "The acknowledged right of a father with respect to the custody and guardianship of his infant children are conferred by the law, it may be with a view to the performance by him of duties towards the children; and in a sense, on condition of performing those duties, but there is great difficulty in closely defining them. It is substantially impossible to ascertain or watch over their full performance, nor could a court of justice usefully attempt it. A man may be in narrow circumstances; he may be negligent, injudicious, and faulty as the father of minors; he may be a person from whom the discreet, the intelligent, and the well-disposed, exercising a private judgment would wish his children to be for their sakes and his own removed; he may be all this without rendering himself liable to judicial interference, and in the main for obvious reasons, it is well that it should be so." Such being the nature of the power claimed and such being

some of the objections to its exercise, it must be apparent to every one (independently of the injunctions of the act of 1798, "that the Orphans' Courts shall not under pretext of incidental powers, or constructive authority, exercise any jurisdiction whatever not expressly given"); that its possession by that tribunal should be denied unless beyond all reasonable doubt the terms of the law vest it or the spirit of the law require it to be comprehended in certain language which seem broad enough to include it.

Prior to the act of 1777, Ch. 8, the courts of the commissary-general and his deputies had jurisdiction only in testamentary affairs, the exclusive cognizance of matters of guardianship being confided to the county courts who were authorized only to appoint guardians to infant orphans' who had no natural guardian. The county courts supervise the management of their estates, and had it in charge by the act of 1715, Ch. 39, Secs. 21 and 22, annually to inquire by a jury " whether the orphans be kept, maintained and educated according to their estates," and to remove their guardians upon default found by the jury. This jurisdiction was for the first time transferred to the Orphans' Court by the act of 1777, Ch. 8. Before that statute the ordinary never exercised either under the laws of England or the laws of Maryland any jurisdiction in the matter of the appointment or removal of guardians. See McPherson on Infancy, p. 74; 4th Burrows, 1436; 3d Cranch C. C., p. 156. Upon the revision of our testamentary system by the act of 1798, the orphans' jury was abolished and in lieu of its functions the Orphans Court was authorized by the 12th section of sub-chapter 15, upon an application suggesting improper conduct in any guardian whatever, either in relation to the care and management of the property or person of any infant to inquire into the same, and at their discretion remove such guardian and make choice of another who shall receive the property and custody of the said ward.

It would scarcely occur to any one who will advert to the history of the orphans' jury and there read the language I have quoted, that the legislature had in contemplation when using the words "any guardian whatever" to confer upon the Orphans' Court the jurisdiction to enter every family in the land upon suggestion from a child or some person on his behalf, investigate its private history and discipline, drag all its painful memories before the public attention and record private shames and private griefs to the scandal of future as well as the present generation, and yet such is the result of the argument in the case, for it is said that the father is the natural guardian of his children, and as the statute says "any guardian whatever," a natural guardian is included in the expression. This argument has its vice in an inversion of the force of language. The aspect in which the father is viewed by the law is that of parent and not of guardian; the latter is the subordinate, the former the paramount relation; the less to be controlled by the greater and not the greater curtailed by the less.

In the language of Blackstone the relation of guardian is *derived out* of that of parent, the guardian being only a temporary parent. Indeed the loose manner in which the term *natural guardian* is used has given rise to much perplexity in the law books and confusion in drafting and interpreting statutes. Its original and proper significancy and energy arose out of the conflict between the claims of tenure and of parental right in the matter of lands held under the fuedal tenure of knight's service or in chivalry. In that case the right to the custody of the person of the infant heir belonged to the father in exclusion of the *lord* in chivalry, who nevertheless retained the wardship of the lands, and was entitled also to the custody of the person as against mother, grandfather and every other relative except the father, whose paramount parental right was acknowledged by the fuedal lawyers under the scholastic designation

of guardian by nature. It is the character of *parent* which the law has in view, and its sacredness at the common law is admirably illustrated in this its triumph over the iron exigency of military tenure. Whenever, therefore, our statutes use the term guardian, the father although in one sense the natural guardian, is never to be included, unless there be something more which imperatively demands that he should be embraced by the expresssion. But it is said that the father is to be embraced by the language of the section, because by the 3d section of sub-chap. 12, in case an infant become entitled by descent or devise to land or to a legacy or distributive share, his natural guardian may be called upon to give bond for the performance of his trust, and upon his neglect or refusal the Court may appoint another guardian. Does it follow from this section that if a father be poor and by any of the contingencies enumerated his child should receive a large portion for which he could find no one willing to go his surety, that therefore the Court shall deprive him of the care and custody, the training, education and social consolation of his child, and confide not only the estate but the person of his child to some wealthier or better known stranger, and yet this conclusion must be reached before the interpretation claimed can be given to the 12th section of sub-ch. 15.

It must be obvious that the other guardian contemplated by the 3d section is a guardian of the *estate only* and not of the person. Repeated adjudications in England has established that a father cannot be deprived of the custody of his child by a devise or legacy accompanied by the designation of guardian, and what is there held to be repugnant to natural right we must not impute to the legislation in the construction of a statute admitting a different meaning.

Chancellor Kent says (2 Commentaries, p. 221, note c), "Attempts have been made to control the father's right to

the custody of his infant children by a legacy given by a stranger to an infant, and the appointment by him of a guardian in consequence thereof. But it is settled that a legacy or gift to a child confers no right to control the father's care of the child, and no person can defeat the father's right of guardianship by such means." In the case of Vanartsdalen *vs.* Boyer, 14 Pa., 385, the Court, on appeal from the Orphans' Court, held that a devise by a grandfather of lands, &c., to grandchildren, containing the clause, "my executors hereinafter named to be guardians for the children of my said daughter during their minority, and I do hereby nominate and appoint them for that purpose," meant merely a devise of the guardianship of the property, but was not intended to interfere with the natural right of the father to the custody and care of his children. Upon these considerations the sound rule of construction would seem to be to limit the power of substitution to the trust, which the legislature for the first time subjected to the jurisdiction of the Orphans' Court by the 3d section of sub. chap. 12, to wit, the security and control of the infants' estate; and that being the case, when we apply the provisions of sec. 12 of sub. ch. 15, we should in like manner limit the terms to the subject matter, to wit, the conduct of the father in the management of the property of his child. The case of Fridge *vs.* The State, 3 Gill and Johnson, p. 113, is relied upon as adjudicating this question. Upon looking at the case it will be found that the present inquiry was not by the remotest hint brought to the mind of the Court. The point before the Court there was whether, it being shown in a suit upon a guardian's bond collaterally that the mother as natural guardian, was living at the time of appointment, that fact did not of itself show that the Orphans' Court transcended its jurisdiction in appointing a third person guardian. And in meeting that objection the Court of Appeals said, "Unless the natural guar-

*47*

dian had failed or neglected to give bond for the perform-
ance of her trust on being called upon to do so, in pur-
suance of the 3d section of the 12th sub. chap., or had
been removed for cause under the provisions of the 12th
sec. of sub. chap. 15, it would not have been the case of
an erroneous judgment," &c.

This chance expression in the course of a judicial opinion
is relied upon as settling the claim of jurisdiction to the ex-
tent insisted on by the appellee. The case before the Court
of Appeals was a case purely involving the estate of the in-
fant and not relating to his custody, and the Court in speak-
ing of " the removal for cause" does not say for what cause, nor
what shall be the extent of the removal, and the language is
perfectly consistent with the idea that the cause for which
the natural guardian shall be removed must be some mis-
conduct or dereliction touching the estate, and that the re-
moval so to be made is a removal from the control of the
estate. Nor do I think the concluding words of the section
give any additional force to the claim, for as I have endeav-
ored to show from the 3d section the statute contemplates
a separation of the custody of the person and the estate in
certain contingencies, and when we come to construe this
12th section, we must adopt the plain rule of rendering
consequents according to their antecedents, giving in those
cases, where the property and person have both come under
the control of the Court, the right to transfer both, and where
the property alone has come under its dominion, the right
to transfer the property only. The foregoing limitation of
the power of the Orphans' Court is necessary to harmonize
the act of 1798 with the Act of Congress of February 20th,
1846, 9th Statutes, p. 4, ch. 8, sec. 1. By its provisions,
when an infant whose father is living shall by gift or other-
wise become entitled to property separate from the father,
the Court may compel him to give bond to account for it as
other guardians, and if he fail or refuse the Court " shall

have power to appoint a *special guardian* to take charge of said property, who shall give bond and security as in other cases, but with condition to *suit the case."* Here we have a legislative declaration that the separate *property* of the infant shall upon the father's default be given in charge to a *special guardian.*

Now what reason can be shown why an infant having property by *gift* should be left to the personal control of his father while he who has a *legacy* or distributive share in the discretion of the Orphans' Court be committed to the charge of another. For the foregoing reasons we think the Orphans' Court precluded from inquiring whether a father be a fit person to be entrusted with the personal custody and education of his children, and that its jurisdiction as to *him* extends only to the due care and management of the infant's estate. It does not appear in this case that the father was permitted to tender a good and sufficient bond for the management of his children's property, nor is there anything in the testimony to show him to be incompetent for *that* task. We think him entitled to that privilege for aught disclosed upon this record.

" Should it appear that it is in some very material and important respects essential to the well being and welfare of children either physically, intellectually or morally that the rights of a father should be suspended, superseded or interfered with, the chancery jurisdiction is ample to afford remedy." (Curtis *vs.* Curtis, 5 Jurist U. S., p. 1148.) In a proper case that tribunal may always be invoked and the interests of society protected without resorting to dangerous rules of construing statutory grants.

It is therefore ordered that the decree of the Orphans' Court rejecting the application of the appellant to be permitted to give bond for the performance of his trust as natural guardian of the estate of his infant children, Samuel C. Barney, jr., Edward D. Barney, Hite G. Barney, and

Clayonia Barney, and that appointing Doctor Harvey Lindsley guardian of the said infants, be reversed and said letters of guardianship issued to said Lindsley are hereby annulled, and this cause is remanded to the Orphans' Court, with directions to cite the said Samuel C. Barney for the purpose of entering into bond with good and sufficient security, to be determined by said court, for the execution of his trust as aforesaid, and upon his neglect or refusal so to do, within a reasonable time to be fixed by said court, then in its discretion to appoint some fit and proper person guardian to take care of and manage the property and estate of said infants in the manner provided by law; the costs of the proceedings in the case to be paid out of the estates of said infants.